UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BROWN RUDNICK LLP,

                            Plaintiff,

    v.                                                      Civil Action No. 21-cv-11964

CHRISTOF INDUSTRIES GLOBAL
GMBH and FMT US INC.,

                            Defendants.

CHRISTOF INDUSTRIES GLOBAL GMBH AND FMT US INC.'S
ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendants Christof Industries Global GmbH ("Christof") and FMT US Inc.

("FMT") (collectively "Defendants"), by their undersigned counsel, respond to plaintiff

Brown Rudnick LLP's ("Brown Rudnick") Complaint and assert Counterclaims as follows:

The Complaint's introductory paragraph contains legal conclusions to which no re-

sponse is required. To the extent that a response is required, the allegations are denied.

PARTIES[1]

1.       On information and belief, admitted.

2.       Admitted that Christof Industries Global GmbH is an Austrian corporation

with a principal place of business at Plabutscherstraße 115 8051 Graz, Austria, otherwise

denied.  Answering further, Defendants state that Christof Industries Global GmbH was

formerly known and did business as Christof Industries GmbH.

3.       Admitted.

---

[1] The headings and sub-headings that appear throughout the Complaint are repeated herein for the Court's convenience. These headings and subheadings include characterizations of the factual allegations and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in each and every heading or sub-heading.

<u>JURISDICTION AND VENUE</u>

4.      The allegations set forth in this Paragraph contain legal conclusions to which no response is required.

5.      The allegations set forth in this Paragraph contain legal conclusions to which no response is required.

<u>FACTS</u>

Christof Industries Global GmbH (f/k/a Christof Industries GmbH, Austria) and FMT's
Engagement of Brown Rudnick

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Denied. Answering further, Defendants state that Christof and FMT engaged Brown Rudnick on November 16, 2018.

11.     Denied. Answering further, Defendants state that Defendants state that Christof Industries Global GmbH was formerly known and did business as Christof Industries GmbH.

12.     Admitted.

13.     Denied. Answering further, Defendants state that the terms of Christof and FMT's engagement of Brown Rudnick were set forth in an engagement letter and fee estimate dated November 16, 2018, which speak for themselves.

14.     Admitted solely that Brown Rudnick represented Christof and FMT in connection with the underlying Arbitration, otherwise denied.

15.     Admitted solely that Brown Rudnick was in contract with Christof and FMT during the arbitration, otherwise denied.

16.     Admitted solely that the Arbitration Panel determined that FMT incurred more than $24.5 million in damages and—after offsetting certain payments and awarding Christof and FMT certain attorneys' fees and costs—awarded Christof and FMT a total award of $6,680,834.02, inclusive of reasonable attorneys' fees and costs which the Arbitration Panel substantially reduced from the fees and costs Brown Rudnick sought, otherwise denied.

17.     Admitted solely that the Arbitration Panel entered an order dismissing all counterclaims asserted against Christof and FMT, otherwise denied.

18.     Admitted solely that Christof and FMT received payment from Swiss Krono SC, LLC and Siempelkamp, Respondents in the underlying Arbitration, on or about July 7, 2021, otherwise denied.

Brown Rudnick's Efforts to Amicably Resolve the Fee Dispute

19.     Denied.

20.     Denied.

21.     Denied. To the extent paragraph 21 characterizes or states the content of Wayne Dennison's April 9, 2020 email, Defendants state that the email speaks for itself.

22.     Denied. To the extent paragraph 22 characterizes or states the content of the April 2020 amendment to the parties' fee agreement, Defendants state that the April 2020 amendment speaks for itself.

23.     Denied.

24.     Denied. To the extent paragraph 24 characterizes or states the content of the July 2020 amendment to the parties' fee agreement, Defendants state that the July 2020 amendment speaks for itself.

25.     Denied. To the extent paragraph 25 characterizes or states the content of the April 2020 and July 2020 amendments to the parties' fee agreement, Defendants state that the amendments speak for themselves.

26.     Denied. To the extent paragraph 25 characterizes or states the content of the April 2020 and July 2020 amendments to the parties' fee agreement, Defendants state that the amendments speak for themselves.

27.     Denied. To the extent paragraph 25 characterizes or states the content of the April 2020 and July 2020 amendments to the parties' fee agreement, Defendants state that the amendments speak for themselves.

28.     Denied.

29.     Admitted solely that Brown Rudnick represented Christof and FMT in connection with the underlying Arbitration, which was held between September and October 2020 and in which a final award was rendered in June 2021, otherwise denied.

30.     Denied.

31.     Denied.

32.     Denied.

33.     Denied.

<u>COUNT ONE: BREACH OF CONTRACT (CHRISTOF AND FMT)</u>

34.     Defendants repeat and incorporate by reference their responses to paragraphs 1 through 33.

35.     Denied. Answering further, Defendants state that the terms of Christof and FMT's engagement of Brown Rudnick were set forth in an engagement letter and fee estimate dated November 16, 2018, which speak for themselves.

36.     Denied. Answering further, Defendants state that the terms of Christof and FMT's engagement of Brown Rudnick were set forth in an engagement letter and fee estimate dated November 16, 2018, which speak for themselves.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

COUNT TWO:
VIOLATION OF MASS. GEN. LAWS C. 93A (CHRISTOF AND FMT)

41.     Defendants repeat and incorporate by reference their responses to paragraphs 1 through 40.

42.     Denied.

43.     Denied.

44.     Denied

45.     Denied.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Denied.

<u>AFFIRMATIVE DEFENSES</u>

**First Affirmative Defense**

The allegations in the Amended Complaint fail to state claim upon which relief may be granted.

**Second Affirmative Defense**

Plaintiff's claims are barred by the doctrine of waiver.

**Third Affirmative Defense**

Plaintiff's claims are barred by the doctrine of laches.

**Fourth Affirmative Defense**

Plaintiff's claims are barred by the doctrine of estoppel.

**Fifth Affirmative Defense**

Plaintiff has unclean hands.

**Sixth Affirmative Defense**

Defendants are relieved of any contractual obligations due to Plaintiff's prior breaches of contract.

**Seventh Affirmative Defense**

Defendants are entitled to an offset due to damages owed to them arising from their Counterclaims.

Defendants reserve the right to amend this Answer to assert any other defenses that may become available or appear during discovery in this case or otherwise.

WHEREFORE, Christof and FMT respectfully request the following relief:

a. Enter judgment in favor of Defendants on all counts in Plaintiff's Complaint;

b. Dismiss all counts of Plaintiff's Complaint;

c.  Award Defendants their costs of litigation, attorney's fees and statutory

interest; and

d.  Award Defendants such other and further relief as the Court deems just and

proper.

**JURY DEMAND**

Defendants demand a trial by jury on all counts and issues so triable.

**COUNTERCLAIMS**

1.     Pursuant to Fed. R. Civ. P. 13, Christof Industries Global GmbH ("Chris-

tof") and FMT US Inc. ("FMT") hereby assert counterclaims against their former lawyers

Brown Rudnick LLP ("Brown Rudnick") for breach of contract, breach of the implied

covenant of good faith and fair dealing, legal malpractice, promissory estoppel, fraudulent

inducement, and violation of M.G.L. ch. 93A § 11.

2.     Christof is a three-generation family business with a global reach which fo-

cuses on the development, assembly, and upkeep of industrial plants. FMT is Christof's

subsidiary, specializing in the installation and maintenance of such plants. In 2018, Chris-

tof and FMT engaged Brown Rudnick, a law firm with a supposedly internationally re-

nowned reputation, to represent them in a $100 million arbitration arising out of a standard

construction contract dispute in South Carolina.

3.     To induce Christof and FMT to engage them, Brown Rudnick agreed and

committed in writing to "not elevate the costs" of the engagement above a $2 million fee

estimate, set out in an executed side letter negotiated in tandem with the engagement let-

ter. Christof and FMT refused to engage Brown Rudnick until Brown Rudnick committed

to the $2 million budget for hourly fees. In particular, Christof and FMT refused to enter

into the engagement until Brown Rudnick deleted language from an early draft of the side
letter stating that the fee estimate was not a prediction of fees:

> Please be advised that our estimates as to the duration and the non-
> contingent legal fees for the representation described in the Engagement Letter
> are based on our experience in arbitration and litigation, and on our current,
> limited knowledge of the facts in this matter. ~~Further, our estimates are  not
> predictions, and the actual duration and fees could vary substantially from these
> estimates due to many unknown and unknowable factors and circumstances.~~

4.      The engagement letter obligated Brown Rudnick to keep Christof and FMT
"apprised relative to expected fees and costs" and to add members to the team only when
"necessary and appropriate." Christof and FMT further put their faith in Brown Rudnick's
boast on its website that "we staff cases efficiently and work closely with clients to make
sure that clients' expectations and the cost of each phase of a case are met and satisfied."

5.      But Brown Rudnick broke all its commitments to Christof and FMT. It ulti-
mately racked up hourly fees of over $6 million. Far from keeping Christof and FMT "ap-
prised relative to fees and costs," Brown Rudnick knew before drafting its fee estimate—
and each of its later fee estimates—that the fees it "apprised" Christof and FMT of were
wrong and that the actual fees would be radically higher.

6.      For example, Brown Rudnick initially forecast monthly fees of about
$40,000 per month, but its first monthly bill was for about $250,000. When Christof and
FMT protested Brown Rudnick's bills that radically overshot the budget, Brown Rudnick
proposed a new budget to induce Christof and FMT to agree to an amendment of the en-
gagement letter. But Brown Rudnick overshot those predicted fees too. For example, on
April 7, 2020 Brown Rudnick predicted that its April 2020 fees would be between
$140,000 - $280,000. The reality, however, which Christof and FMT learned only upon

receiving the bill, was that the April 2020 fees were nearly twice the ceiling of the estimate, $544,804.50.

7.      Indeed, while Brown Rudnick originally forecast the *total* fees for its engagement would be at most $2 million, over one year and millions of dollars in fees after the engagement began Brown Rudnick's new estimate provided that its remaining fees *alone* would cost Christof and FMT over $2.1 million. And even that estimate proved to be false: in reality, Brown Rudnick's claimed hourly fees during the ten-month estimate period topped $3.1 million. There is just one inference to be drawn from Brown Rudnick's persistent overbilling: it always knew that it would not abide by its fee estimates and budgets, but withheld its knowledge of the actual fees to induce Christof and FMT to enter into and, later, to continue the engagement by entering into amendments to the engagement letter.

8.      Brown Rudnick's fees were so high because it unnecessarily and improperly assigned dozens of billable professionals to the team, consistently overbilled for tasks, had multiple attorneys working on projects suited to a single attorney, had attorneys undertaking administrative work, and was otherwise impermissibly inefficient. For example, in May 2020, a single attorney billed 231.1 hours over twenty-five consecutive days, *$145,593* in fees, drafting the direct examination of one witness. Brown Rudnick billed over forty hours of attorney time for assembling binders. In a number of time entries that verge on satire, Brown Rudnick attorneys even billed for drafting and corresponding about a proposal for their "binder compilation strategy."

9.      Brown Rudnick's decisions—without client input—to assemble a team of 27 billable professionals made their work on the case terribly inefficient: every new team

member had to "ramp up" to understand the case and there was no one on the team with a firm grasp of the entire matter. Brown Rudnick attorneys and timekeepers often were un-informed and unprepared during strategy discussions. Brown Rudnick regularly had two or even three partners, whose billable rates were in the $1,000 per hour range, all devote very significant time to drafting a single document.

10.     Following the arbitration, Brown Rudnick tried to recover over $6,891,527.20 million in claimed attorneys' fees, which included both hourly fees and a contingency fee. The arbitral panel rejected Brown Rudnick's fees as unreasonable. It found that the $2.8 million in fees Christof and FMT had *already paid* were unreasonable, and that Brown Rudnick was entitled to less than $2.3 million. This was in part because Brown Rudnick had achieved a barely $4 million recovery on claims of $81 million, plus treble damages and attorneys' fees. While technically a victory, it was far from a "home run," as the arbitral panel explained.

11.     But Brown Rudnick was worse than inefficient: they were negligent in their representation in a manner that caused Christof and FMT not to recover millions of dollars of damages. The underlying arbitration related to the construction of a fiberboard produc-tion facility in which FMT was hired to, among other things, install the production equip-ment. FMT alleged that the company with which it contracted had withheld material infor-mation, namely that the delivery of critical materials would be delayed, resulting in very substantial costs to FMT. Brown Rudnick had the documents to prove those unfair busi-ness practices. Indeed, it had emails in which FMT's counterparty admitted to causing the at-issue delay which it never disclosed to FMT. Brown Rudnick did not use those docu-ments in the arbitration, as any reasonable attorney would have done. The arbitral panel

awarded over $11 million in damages to FMT on its breach of contract theory flowing

from the delays. But as a direct result of Brown Rudnick's failure to leverage the docu-

ments which proved the unfair business practice of withholding material information

about the delay of materials, the arbitral panel did not treble those damages under the ap-

plicable unfair trade practices act.

12.     On the basis of this constellation of facts, as set forth in greater detail be-

low, Christof and FMT bring claims against Brown Rudnick for Breach of Contract

(Count I), Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II),

Fraudulent Inducement (Count III), Promissory Estoppel (Count IV), Legal Malpractice

(Count V), and violation of M.G.L. c. 93A, Section 11 (Count VI).

## THE PARTIES

10.     Christof Industries Global GmbH is an Austrian corporation with a principal

place of business at Plabutscherstraße 115 8051 Graz, Austria.

11.     FMT US Inc. is a South Carolina corporation with a principal place of busi-

ness at 130 Satellite Blvd., Suwanee, GA 30549, USA.

12.     Brown Rudnick LLP is a Massachusetts limited liability partnership with a

principal place of business at One Financial Center, Boston, MA 02111.

## JURISDICTION

13.     This Court has supplemental jurisdiction over this Counterclaim pursuant to

18 U.S.C. § 1367.

## FACTS

### BACKGROUND

**Christof and FMT**

14.     Christof is a family-run group of companies that specialize in the construction, assembly, and upkeep of industrial plants. Although Christof was founded in 1966, the Christof family has a long heritage working with industrial plants and related technology that dates back to 1846.

15.     Today, Christof has over 4,000 employees and 4,500 investment projects worldwide. Its goal is to provide a 360° portfolio of clean technologies and sustainable industrial services to customers in various industries around the world, enabled by its process knowledge, extensive experience, and cutting-edge technologies.

16.     FMT is one of Christof's subsidiaries. It specializes in mechanical and electrical assembly, power plant engineering, mill installation and maintenance, and the maintenance and repair of industrial machinery and plants.

**Brown Rudnick**

17.     Founded in 1948, Brown Rudnick has a purported reputation as a prestigious and highly sophisticated law firm. It is an AmLaw 200 international law firm with offices in New York, London, Paris, Boston, California, and Washington, D.C.

18.     Its clients include public and private corporations, multinational Fortune 100 businesses, and start-up enterprises.

19.     Brown Rudnick promotes itself as a law firm "designed for speed and performance." It claims on its website that it provides "muscular, integrated service, timely delivered" and states that its representation of clients is "not abstract or opaque."

20.     When it comes to litigation, Brown Rudnick describes itself as a top-notch, highly successful law firm. As Brown Rudnick puts it on its website: "Our lawyers find winning strategies in some of the most complex, major financial and business disputes where our clients have been given little or even no chance for success." It further claims that "we routinely craft and implement novel theories and strategies opposite entrenched interests represented by major law firms."

21.     Brown Rudnick takes particular pride in the cost efficiency of its services. It claims on its website that "we staff cases efficiently and work closely with clients to make sure that clients' expectations and the cost of each phase of a case are met and satisfied."

22.     According to Brown Rudnick's website, Wayne Dennison ("Attorney Dennison"), the lead attorney in Brown Rudnick's representation of Christof and FMT, is a "general commercial litigator, with a national litigation practice, and is a Practice Group Leader of the Firm's Litigation & Arbitration Practice Group." The website promotes Attorney Dennison as a top-notch litigator who "handles high stakes litigation through jury trial and appeals" relating to a diverse array of subject matters.

23.     Philip Small ("Attorney Small"), who also helped to lead Brown Rudnick's representation of Christof and FMT, is the Practice Group Leader of Brown Rudnick's Energy, Regulatory, and Environmental Practice Group.

## CHRISTOF AND FMT ENGAGE BROWN RUDNICK BASED UPON BROWN RUDNICK'S COMMITMENT AND AGREEMENT TO A BUDGET

24.     In or around October 2018, Christof and FMT reached out to Brown Rudnick to discuss the possibility of Brown Rudnick representing Christof and FMT in the mediation and arbitration of certain disputes arising out of the allegedly unlawful termination of FMT's

13

contract to install equipment and steelwork for a fiberboard production facility in Barnwell, South Carolina (the "Barnwell Dispute").

25.     For several weeks, the parties negotiated the scope of terms of Brown Rudnick's potential engagement.

26.     Throughout those negotiations, Christof and FMT stressed the importance of keeping costs down to maximize any potential recovery they obtained in the Barnwell Dispute. Christof and FMT were particularly concerned about overbilling and the potential for the dispute to drag on unnecessarily. They repeatedly expressed these concerns to Brown Rudnick.

27.     Christof and FMT insisted upon a cap on Brown Rudnick's hourly fees before agreeing to engage Brown Rudnick.

28.     To assuage Christof and FMT's concerns about escalating fees, Brown Rudnick agreed to provide a fee estimate letter ("Side Letter") setting out the anticipated fees in the case alongside their standard Engagement Letter.

29.     From November 9, 2018 to November 16, 2018, the parties negotiated the terms of the Side Letter and the Engagement Letter via multiple drafts exchanged among the parties, emails, and in-person meetings.

30.     During the negotiations regarding the engagement, Christof repeatedly expressed to Brown Rudnick that it was critical for the fees and costs of representation not to exceed the estimate set out in the Side Letter.

31.     Brown Rudnick agreed not to exceed the estimate set out in the Side Letter. Brown Rudnick also agreed to keep Christof and FMT closely informed of anticipated fees.

32.     The final Side Letter set out Brown Rudnick's estimate as to the total cost of the case exclusive of a contingency fee component.

33.     On November 16, 2018, Attorney Small, a partner at Brown Rudnick, sent Christof an email titled "Engagement Letter and Side Letter—Execution Copies," which enclosed both documents and stated:

> Dear Oliver,
>
> The signed Engagement Letter and signed Side Letter are attached. Please countersign the Engagement Letter for both Christof Industries and FMT, fill in the blanks on page 8, and then send me a pdf of that page.

A true and correct copy of this email is attached here as <u>Exhibit</u> <u>A</u>.

34.     The finalized Engagement Letter and Side Letter, true and correct copies of which are attached here as <u>Exhibit</u> <u>B</u> and <u>Exhibit</u> <u>C</u> respectively, set forth the scope of Brown Rudnick's engagement.

**The Engagement Letter**

35.     The Engagement Letter outlined Brown Rudnick's fee and cost structure, provided for a retainer, and identified which Brown Rudnick attorneys would have primary responsibility for the case.

36.     Under a section titled "Staffing, Fees, and Expenses," the Engagement Letter identified two lawyers who were to have primary responsibility for engagement: Attorney Small, with an hourly rate of $895, and Attorney Dennison, with an hourly rate of $1,045. <u>Ex</u>. <u>B</u> at 2.

37.     The same section of the Engagement Letter provided that other "lawyers and Firm personnel" would be added to the team only "[t]o the extent necessary and appropriate." <u>Id</u>.

38.     Under a section titled "Communication," Brown Rudnick agreed to "keep you apprised relative to expected fees and costs, and communicate whenever there are important choices to be made that are likely to affect overall fees and costs." Id. at 7.

39.     The Engagement Letter provided that Christof and FMT would pay one-half of Brown Rudnick's hourly rates contemporaneously, and deferred payment of the remaining half until Christof and FMT obtained a recovery in the Barnwell Dispute. Id. at 2.

40.     In addition to Brown Rudnick's normal hourly rates, the Engagement Letter provided for a success fee on any recovery Christof and FMT received that varied between 20-40 percent depending on the amount of recovery. Id. at 3.

41.     The Engagement Letter also provided for an initial one-time retainer of $200,000, payable upon execution of the parties' agreement, and a supplemental ongoing retainer of $40,000 per month. Id. at 4.

42.     The parties agreed, and Christof and FMT understood, that the retainer represented the upward bound of Christof and FMT's financial "risk" on the case, i.e. that Brown Rudnick's monthly bills would not significantly exceed $40,000 per month.

**The Side Letter**

43.     The Side Letter provided Brown Rudnick's "estimate[] of the duration and of the non-contingent legal fees related to the Engagement Letter." Ex. B at 1.

44.     Christof and FMT insisted upon such a letter in order to protect themselves from any material fee increases.

45.     Christof and FMT refused to execute the Engagement Letter until the Side Letter was finalized.

46.     In the Side Letter, Brown Rudnick stated that its aggregate discounted fees—i.e. the one-half fees that Christof and FMT would be required to pay contemporaneously during Brown Rudnick's representation—"will be in the range of $750,000 to $1.0 million for a full arbitration proceeding and proceeding to vacate and/or confirm the arbitration award, but not appeals therefrom." Id. at 1.

47.     Thus, Brown Rudnick's total fee estimate for litigating the Barnwell Dispute through arbitration was between $1.5 million to $2.0 million, excluding any contingency fee.

48.     An early draft of the Side Letter included language making clear that Christof and FMT should not rely upon any fee estimate: "[O]ur estimates are not predictions, and the actual duration and fees could vary substantially from these estimates due to many unknown and unknowable factors and circumstances."

49.     Given how important it was to Christof to keep a firm limit on the fees they might incur, consistent with previous discussions among the parties, on November 11, 2018 Christof wrote to Brown Rudnick to express that "we agreed that our 'risk' is [the] 200k [retainer] plus 40k per month for 12 Months" at the discounted rate before payment on the balance of Brown Rudnick's fees at the full rate might later become due. A true and correct copy of the November 11, 2018 email chain containing this statement is attached as Exhibit D.

50.     Indeed, where the early draft of the Side Letter categorically stated that the estimates are not predictions, Christof and FMT expressed concern that "BR could just elevate the costs which we can't control or have any clue about." Id.

51.     Christof continued, "if fees go higher which only br can control we don't
have a cap at all," which was the parties' intent. Id.

52.     In response to Christof's concerns, Brown Rudnick wrote, "BR will not ele-
vate the costs .... I will be overseeing this ..." Id.

53.     Consistent with Brown Rudnick's commitment not to elevate costs beyond
those set out in the Side Letter, on November 15, 2018 Attorney Small deleted from the
Side Letter the language explaining that the "estimates are not predictions" and "could vary
substantially." He further deleted the word "limited" to describe the firm's knowledge of
the matter:

PHILIP M. SMALL
ATTORNEY-AT-LAW

Direct Dial: 860-509-6575
Direct Fax: 860-509-6575
psmall@brownrudnick.com

November __, 2018

Mr. Johann Christof
Christof Industries GmbH, Austria
Plabutscherstrasse 115
Graz 8051, Austria

     Re:    ***Estimates of Dispute Resolution Proceedings Duration  and Fees***

Dear Mr. Christof:

    This letter responds to your request for our estimates of the duration and
of the non-contingent legal fees on the matter described in the signed
Engagement Letter dated November __, 2018 regarding our representation of
Christof Industries GmbH, Austria and FMT US, Inc. in connection with the
mediation and arbitration of their contractual disputes with Siempelkamp
Maschinen- und Anlagenbau GmbH ("Siempelkamp") and Swiss Krono SC, LLC
("Swiss Krono").

    Please be advised that our estimates as to the duration and the non-
contingent legal fees for the representation described in the Engagement Letter
are based on our experience in arbitration and litigation, and on our current,
~~limited~~ knowledge of the facts in this matter. ~~Further, our estimates are  not
predictions, and the actual duration and fees could vary substantially from these
estimates due to many unknown and unknowable factors and circumstances.~~

54.     Christof and FMT relied upon Brown Rudnick's removal of the language stating that the fee estimate was not a prediction in response to Christof and FMT's insistence upon a fee cap to mean that the fee estimate contained in the Side Letter was a prediction of fees.

55.     On various occasions, Brown Rudnick verbally and in writing also told Christof and FMT that its fees would not exceed the estimate set out in the Side Letter.

56.     Christof and FMT relied upon Brown Rudnick's repeated representations, both verbal and in writing, that its fees would not exceed those set out in the Side Letter to decide to engage Brown Rudnick.

57.     Christof and FMT trusted that Brown Rudnick would be honest and forthright with them.

### THE BARNWELL DISPUTE

58.     The Barnwell Dispute arose out of a construction project to build a $230 million fiberboard production facility in Barnwell, South Carolina.

59.     In September 2016 Swiss Krono SC, LLC ("Swiss Krono"), the project owner, contracted with SICO to design and manufacture the fiberboard production equipment and related structural steel (the "Supply Contract").

60.     On August 17, 2017, Swiss Krono and Siempelkamp ("SICO"), the project's designer, manufacturer, and supplier" (together, the "Employers"), retained FMT to install the structural steel needed to support the production equipment, install the production equipment itself, and install the mechanical and electrical work required for the equipment at the Barnwell jobsite. All of FMT's work depended upon the timely delivery of the

required steel. The parties accordingly entered into a lump sum installation contract (the "Installation Contract") for $39,990,000 for FMT's work.

61.     The Installation Contract required Christof, FMT's parent company, to provide a parent company guarantee of FMT's performance under the contract worth fifty percent of the contract price, or USD $19,995,000.

62.     FMT was unable to undertake its installation work under the contracted schedule because structural steel and other components, which were SICO's responsibility to timely provide, did not arrive on time.

63.     Delays in the delivery of steel resulted in FMT's work becoming dramatically more expensive and inefficient, as experts testified at the arbitration. The delays ultimately cost FMT many millions of dollars in loss of productivity and inefficiencies.

64.     Ultimately, due in part to these delays, the Employers terminated FMT's contract, thereby invoking Christof's parent company guarantee.

65.     On December 29, 2018, FMT, through Brown Rudnick, filed a demand for arbitration against the Employers. FMT asserted nine claims, including claims for violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), fraudulent inducement, negligent misrepresentation, and breach of contract.

66.     In its Demand, FMT alleged that the Employers knew at the time of the execution of the Installation Contract that they would be unable to comply with the steel and equipment delivery dates set forth in the Contract because of significant delivery delays.

67.     The Employers knew that such significant delays would result in FMT's work becoming radically more expensive for FMT to complete.

68.     While withholding that material information, the Employers induced FMT to execute the Installation Contract for a lump sum price that they knew was unreasonable in light of the delayed delivery of materials.

69.     FMT has expertise in installing production equipment efficiently, but that system is compromised, resulting in dramatically higher costs, where FMT's counter party causes delays as the Employers did here.

## BROWN RUDNICK IMMEDIATELY BEGINS EXCEEDING ITS ESTIMATED FEES

70.     As soon as Brown Rudnick began its representation of Christof and FMT, its monthly invoices radically outpaced the fee estimate in the Side Letter.

71.     Per the Side Letter, Brown Rudnick estimated that its total fees for litigating the Barnwell Dispute through arbitration would be between $1.5 million to $2 million. However, by the time Brown Rudnick's representation ended, its invoiced fees amounted to just over $6 million, more than triple the Side Letter's estimate.

72.     At all times, including before executing the Side Letter, Brown Rudnick knew that its hourly fees would exceed $2 million.

73.     In contravention of the obligation set out in the Engagement Letter to "keep [Christof and FMT] apprised relative to expected fees and costs" and despite Christof and FMT's repeated inquiries about billing, Brown Rudnick failed to keep Christof and FMT apprised of their skyrocketing bills.

74.     Brown Rudnick never told Christof and FMT that its expected fees and costs would exceed the estimate set out in the Side Letter.

75. The size of Brown Rudnick's team of attorneys and other billable professionals working on the case also quickly contravened the contractual terms of the Engagement Letter.

76. The Engagement Letter provided that Attorneys Small and Dennison would have "primary responsibility" for the Barnwell Dispute, with other "lawyers and Firm personnel" added "[t]o the extent necessary and appropriate." Ex. B at 2.

77. However, by the time the Barnwell Dispute ended, twenty-seven Brown Rudnick hourly billable attorneys, paralegals, and other hourly billable staff—nearly all attorneys—had worked on the team.

78. It was neither necessary nor appropriate for the overwhelming majority of the twenty-seven Brown Rudnick hourly billable attorneys, paralegals, and staff to work on the Barnwell Dispute.

79. Brown Rudnick could have effectively litigated the case with far fewer than twenty-seven hourly billable professionals.

80. The sheer number of professionals on the case, particularly attorneys, contributed to Brown Rudnick's inefficiencies.

81. As a result of adding dozens of professionals to the team, much time was wasted as new team members "ramped up."

82. The size of the team also meant that responsibilities were divided among many individuals such that no individual attorney had mastery of the case.

83. Indeed, on many occasions, Brown Rudnick attorneys would repeatedly ask for information and documents which Christof and FMT had previously provided.

84.     All of these problems—overbilling, lack of communication, and unnecessary staffing—arose almost immediately after Brown Rudnick's representation of Christof and FMT began.

85.     December 2018, the first full month of Brown Rudnick's representation of Christof and FMT, is reflective of Brown Rudnick's inefficient and costly billing practices throughout the engagement.

86.     In December 2018, Brown Rudnick billed a total of $254,590.00 in monthly fees.

87.     This was a shock to Christof and FMT, given Brown Rudnick's commitment to a $40,000 monthly budget.

88.     These high fees were partially driven by the fact that Brown Rudnick had added two associates and a third partner to the team. The associates billed at $600 per hour (later, $690 per hour) and $540 per hour (later $630 per hour). The third partner, Rebecca MacDowell Lecaroz ("Attorney Lecaroz"), billed at $775 per hour and, later, $815 per hour. All three new attorneys billed over 50 hours each to the Barnwell Dispute during the month of December 2018 alone. The same month, Brown Rudnick's Senior Litigation Technology Specialist was also added to the team at a rate of $425 per hour.

89.     Consistent with Brown Rudnick's work throughout its representation of Christof and FMT, in December 2018 multiple lawyers—including multiple partners—billed very substantial amounts of time for tasks that could have efficiently and effectively been completed by one lawyer, or by a partner and associate.

90.     For example, the December 2018 invoice included significant time by five lawyers, including by partners Small, Dennison, and Lecaroz, on the arbitration demand. All three partners also spent a great deal of time on a mediation agreement.

91.     Brown Rudnick also consistently spent substantially more time than necessary on simple tasks. Again using the December 2018 invoice as an example, Brown Rudnick spent about 4.5 hours of attorney time drafting, reviewing, and revising a litigation hold letter, which is a standard piece of correspondence requiring little or no original work.

92.     Further, from the outset of the case, Brown Rudnick practiced what is known as "block billing."  Block billing involves lumping together multiple tasks without specifying how much time was spent on discrete activities. Because block billing obscures the actual time spent on individual tasks, it makes overbilling easier to justify.

93.     For example, in December 2018, one Brown Rudnick timekeeper spent 4.7 hours reviewing documents, drafting document preservation letters, and speaking with opposing counsel. Because the timekeeper block billed, it is impossible to know how much the time was spent on each individual task.

94.     This practice was common among nearly all Brown Rudnick timekeepers. In total, Brown Rudnick billed over 5,000 hours as block bills.

95.     All of the above-described practices continued throughout Brown Rudnick's representation of Christof and resulted in excessive invoices. These practices were exacerbated by the repeated additions of unnecessary new team members, including many lawyers, who had to "ramp up" to learn the case.

## BROWN RUDNICK'S INEFFICIENCIES
## EXTEND THE TIMELINE OF THE BARNWELL DISPUTE

96.     Despite Brown Rudnick's estimate in the Side Letter that the Barnwell Dispute would take only a year to litigate through mediation and arbitration, Brown Rudnick's poor planning and inefficiencies quickly eclipsed this timeline.

97.     This was largely due to the fact that Brown Rudnick insisted that Christof and FMT participate in mediation with the Employers before the parties arbitrated the dispute.

98.     Christof and FMT repeatedly informed Brown Rudnick that the parties were so far apart in their negotiations that the matter could not be resolved via mediation.

99.     Brown Rudnick agreed that mediation would not be successful.

100.    Nevertheless, Brown Rudnick insisted that Christof and FMT mediate because it would "look bad" if they did not do so.

101.    A mediation date was set for April 2020—well over a year away.

102.    All the while, Brown Rudnick's invoices continued to spiral out of control. In January 2019, Brown Rudnick billed $103,747.50 in monthly fees; in March 2019, it billed $156,533.50 in monthly fees. In September and October 2019, Brown Rudnick billed monthly fees of $281,584.50 and $441,952.00, respectively.

103.    All of these bills vastly exceeded the approximate budget of $40,000 per month that the parties had agreed to.

104.    By September 2019, Brown Rudnick had fourteen timekeepers billing to the Barnwell Dispute in addition to Attorney Dennison and Attorney Small. These timekeepers frequently performed unnecessary and duplicative tasks and billed hundreds of hours with vague invoice descriptions.

105.    One particularly prominent example of this unnecessary and duplicative work was the time Brown Rudnick spent on document review.  Early in Brown Rudnick's representation, the parties agreed that Christof and FMT would undertake the initial review of documents for potential production because many of the key documents were in German. However, Brown Rudnick nevertheless billed many hundreds of hours to document review over several months. For instance, in September 2019, about a month after Christof and FMT began their review, Brown Rudnick associates billed over 230 hours to reviewing documents.

### CHRISTOF AND FMT ATTEMPT TO REIN IN BROWN RUDNICK'S BILLING

106.    After receiving Brown Rudnick's September 2019 and October 2019 invoices for fees of $281,584.50 and $441,952.00 respectively, one of Christof's executives expressed dismay that Brown Rudnick's bills vastly outstripped the parties' agreed limits:

> If we would have know [sic] this [that the bills would be so high], we would have looked very carefully in the first months how our 200k down payment was used against the costs at the beginning, which we didn't as we worked along the [Side Letter] where BR confirmed the total costs for us between 750-1000k for the case—basically 200k upfront and 40k for 12 months = 680k, plus extra costs for experts, etc...

A true and correct copy of this email is attached at Exhibit E.

107.    Christof and FMT agreed to pay the September invoice, but sought assurances that Brown Rudnick would not radically exceed the cap again. See id at 1.

108.    However, Christof's request fell on deaf ears. Brown Rudnick's November 2019 invoice amounted to $164,028.50 in fees, pushing Brown Rudnick's total fees to-date above $2 million.

109.    Thus, well before the mediation or arbitration even took place, Brown Rudnick's total fees exceeded the estimate in the Side Letter.

110.    All three of these invoices—September, October, and November 2019—contained egregious overbilling to unnecessary and duplicative tasks.  During these months, Brown Rudnick billed significant attorney time to non-attorney work, including, as just one example, many hours of attorney time devoted to assembling binders.  In fact, over the course of the representation, Brown Rudnick attorneys spent upwards of forty hours assembling binders.  In particularly stunning time entries, multiple Brown Rudnick attorneys spent a number of hours drafting and corresponding about a proposal for their "binder compilation strategy."

111.    Similarly, in October 2019, one Brown Rudnick associate billed a total of 207.3 hours to the Barnwell matter, an average of 9 hours per business day. The vast majority this associate's time was devoted to document review, despite the agreement between Brown Rudnick and Christof for Christof to undertake that work.

112.    In December 2019, Christof's CEO, CFO, and other Christof executives asked to meet with Brown Rudnick in New York, NY to discuss how to keep Brown Rudnick's fees and costs down.

113.    The parties agreed to meet in January 2020. Before the meeting, one of Christof's executives emphasized to Brown Rudnick:

> [I]t will be very important to discuss the costs matter during our meeting in January as [we] have already passed the total cost estimate provided within your [Side Letter], having reached only half way [sic], which means the total cost for the whole case will be by far exceeding the expected costs, which are based on your [Side Letter], which was also the basis of the success fee element.

A true and correct copy of this email is attached at Exhibit F.

114.    During the January 2020 meeting, the parties agreed to move forward and work together to minimize Brown Rudnick's costs.

115.    Brown Rudnick provided a fee estimate at the January 2020 meeting. It estimated that its fees from the meeting through to mediation in April 2020 would be between $100,000 and $150,000.

116.    However, Brown Rudnick again failed to honor its commitment on fees. Brown Rudnick's invoice for January 2020 alone amounted to $270,023.50, nearly double the ceiling of fees that Brown Rudnick had estimated just the month prior.

117.    Again, Brown Rudnick knew at the time it provided its estimate to Christof and FMT that its actual fees would be far higher.

118.    Again, however, Brown Rudnick withheld from Christof and FMT its actual estimate of fees.

119.    As with earlier invoices, the January 2020 invoice contained numerous examples of overbilling, vague time entry descriptions, and duplicative work, including numerous hours spent "assembling binders" and "preparing for meetings," and bills for unspecified amounts of "travel time."

120.    Worse yet, contrary to the parties' agreement that Christof and FMT would be responsible for reviewing documents, Brown Rudnick attorneys continued to review documents.

121.    At the same time, other Brown Rudnick attorneys spent many hours meeting with Christof and FMT multiple times to discuss Christof and FMT's own document review. Thus, there is no question that Brown Rudnick knew Christof and FMT were to undertake the document review.

## THE PARTIES' RE-NEGOTIATE THEIR FEE AGREEMENT
## TO ADDRESS BROWN RUDNICK'S OVERBILLING

122.    By late 2019, Christof and FMT had begun to worry that Brown Rudnick was not devoting its best efforts to the case. Too often, Christof and FMT were forced to explain and then re-explain basic aspects of the Barnwell Dispute to Brown Rudnick, and during meetings Brown Rudnick attorneys frequently appeared unprepared and were unaware of key documents and facts.

123.    For instance, although Christof and FMT identified numerous key documents and brought them to Brown Rudnick's attention, Brown Rudnick would often forget or misplace these documents and Christof and FMT would be forced to re-send them, sometimes multiple times.

124.    Christof and FMT became concerned that because Brown Rudnick was only receiving payment for half of its attorneys' fees contemporaneously, it was not incentivized to work efficiently or perform its work with the same quality it provided to other clients.

125.    In February 2020, to address Brown Rudnick's climbing fees, the parties came to the following agreement: Christof and FMT would pay the November 2019, December 2019, and January 2020 invoices at the 50% discounted rate, and in exchange Brown Rudnick would cap its fees through the mediation at $50,000 at the discounted rate. The parties hoped that the mediation would resolve Barnwell Dispute. If not, they agreed to revisit the issue of fees afterwards.

126.    The mediation was scheduled to take place on April 2-3, 2020.

127.    As Christof, FMT, and Brown Rudnick had predicted since the outset of the Barnwell Dispute, the mediation was unsuccessful.

128.    Accordingly, to re-start the parties' fee discussions, Christof and FMT asked Brown Rudnick to provide an updated fee estimate.

129.    On April 7, 2020, Wayne Dennison provided Christof and FMT with the following estimate of Brown Rudnick's total (not discounted) fees going forward (the "April Estimate"):

| Month | Total Monthly Fees |
|---|---|
| April 2020 | $140,000-$280,000 |
| May 2020 | $140,000-$280,000 |
| June 2020 | $100,000-$120,000 |
| July 2020 | $200,000-$300,000 |
| August 2020 | $350,000-$420,000 |
| Sept 1-Oct 2, 2020 (Arbitration Hearing) | $600,000-$700,000 |
| Oct-Nov, 2020 (Post-Hearing) | $75,000-$80,000 |

A true and correct copy of the email containing this fee estimate is attached at Exhibit G.

130.    In total, the April Estimate provided that Brown Rudnick's fees going forward would amount to over $2.1 million.

131.    This $2.1 million figure—which was only for the remaining eight months of Brown Rudnick's representation—was higher than the Side Letter's original estimate of $2 million for the entire Barnwell Dispute.

132.    Brown Rudnick sought to justify the April Estimate by claiming that the fee estimate in the Side Letter did not fully contemplate certain conditions. First, Brown Rudnick asserted that the "anticipated hearing date" had been set later than anticipated. See Ex. G at 1. However, Brown Rudnick provided no explanation for why a later hearing

date would result in far higher fees. There is no such explanation. Further, Brown Rudnick was responsible for the later hearing date by insisting upon mediating despite its agreement and recognition that the mediation would be unsuccessful.

133.   Second, Brown Rudnick suggested that the Barnwell Dispute required more significant work as a result of certain factors Brown Rudnick had not anticipated at the time it provided the Side Letter. Id. at 1. However, the Side Letter was not flexible based upon additional information that Brown Rudnick might obtain about the engagement. To the contrary, Brown Rudnick *deleted* from an early draft of the Side Letter language providing that its knowledge of the facts was "limited" as well as a provision that the "estimates are not predictions" such that "the actual duration and fees could vary substantially from these estimates due to many unknown and unknowable factors and circumstances." Ex. C.

134.   Three days after providing the April Estimate, on April 10, 2020, Brown Rudnick stated it was halting all work on the matter unless an agreement on paying the outstanding fees, which far outstripped the estimate in the Side Letter, was reached. Attorney Dennison told Christof and FMT that "we need to get this squared and sorted before we spend any more time on this matter. … We are going 'pencils down' in the interim."

135.   In other words, Brown Rudnick radically exceeded the fee limit in the Side Letter and then refused to continue working unless Christof and FMT agreed to pay higher fees.

136.   As a result, and in reliance on Brown Rudnick's April Estimate, Christof and FMT agreed to negotiate an amendment of the Engagement Letter's payment terms.

137.    Over the next week, the parties negotiated the terms of the amendment. Christof and FMT repeatedly stressed the importance that Brown Rudnick stick to the fees outlined in the April Estimate.

138.    On April 21, 2020, Attorney Dennison sent an email to Christof and FMT stating "We fully acknowledge and understand your fee sensitivity and will commit that, on a monthly basis, we will consult with you as to how our fees compare to the budget with which you were provided on April 6.  We will, of course, also commit to trying to minimize your fees and to trying to deliver our services for less than the amount that we have budgeted." A true and correct copy of the email containing this statement is attached at Exhibit H.

139.    Brown Rudnick failed to abide by those commitments. Among other things, it failed ever to consult with Christof and FMT as to how its fees care to the budget from April 6.

140.    Based on Brown Rudnick's ongoing representations that it would abide by the April Estimate, Christof and FMT agreed to execute the amendment to the Engagement Letter.  The amendment, a true and correct copy of which is attached here at Exhibit I, set out dates by which Christof and FMT were required to make certain payments and provided two fee arrangement options for Christof and FMT's election ("April Amendment").

141.    At the time the parties' signed the April Amendment, Brown Rudnick knew that its fees would be dramatically higher than the April Estimate. However, Brown Rudnick chose not to disclose its actual estimate to Christof and FMT because it knew that if it did, Christof and FMT would not agree to the April Amendment.

142.    Indeed, after the parties executed the April Amendment, Brown Rudnick's bills immediately began outstripping the April Estimate.  Brown Rudnick's May 2020 invoice contained $544,804.50 in legal fees—almost double the high end of the April Estimate.

143.    As with Brown Rudnick's other invoices, the May 2020 invoice contained inefficient and duplicative billing.

144.    For example, one timekeeper racked up $145,593 in fees and 231.1 hours—an average of over 9 hours per day over twenty-five consecutive days—to preparing a single witness's testimony.

145.    When Christof and FMT balked at paying these unexpectedly high fees that contradicted the April Estimate, Brown Rudnick once again went "pencils down" on June 3, 2020.

146.    Again, Christof and FMT were forced to agree to pay because it would have placed them at a severe disadvantage to hire new legal counsel.

147.    The next day, on June 4, 2020, Brown Rudnick proposed a second amendment to the Engagement Letter's payment terms "in an effort to formalize our relationship going forward."  Like the first amendment, the second amendment set out dates by which Christof and FMT were required to make certain payments and provided two fee arrangement options for Christof and FMT's election.

148.    However, Christof and FMT were reluctant to enter into the second amendment because Brown Rudnick continually broke its agreements to limit its fees.

149.    As one of Christof's executives explained to Brown Rudnick's CEO:

> Our biggest issue again is the lack of transparency in relation to the fees, especially as we [] received an updated fee estimate from your

> firm on the 7th of April which just 8 weeks later is completely out of line, again … You will appreciate that this looks very much like someone is dumping hours on our account, especially as our team has seen lawyers booking on our account who don't seem to be very well informed about our case and our team has to explain everything over and over. … We need to find a way that allows us to budget correctly and fairly and currently this is not the case.

A true and correct copy of this email is attached at Exhibit J.

150.    Brown Rudnick assured Christof and FMT that going forward they would abide by the April 7, 2020 fee estimate.

151.    But Brown Rudnick's invoice for its June 2020 work contained $344,084.00 in legal fees. This time, Brown Rudnick's fees were almost *three times* the April Estimate, which budgeted between $100,000 and $120,000 for the month of June.

152.    Brown Rudnick never apprised Christof and FMT that its fees would (again) be so much higher than predicted.

153.    Ultimately, however, Christof and FMT were forced to agree to a second amendment to the Engagement Letter's payment terms. After some negotiation, the parties executed the amendment on July 16, 2020. A true and correct copy is attached here at Exhibit K.

### THE ARBITRAL PANEL FINDS BROWN RUDNICK'S FEES ARE UNREASONABLE

154.    At the arbitration, Brown Rudnick failed to prevail on the overwhelming majority of FMT's nine claims.  All together, FMT had claimed $81 million in damages plus treble damages and attorneys' fees, but ultimately only recovered an award of $4,203,826.

155.    As the prevailing party, FMT was entitled to its reasonable attorney's fees and costs. Accordingly, as part of the Final Award, the arbitral panel analyzed Brown Rudnick's fees.  A true and correct copy of the Final Award is attached hereto as Exhibit L.

156.    In total, Brown Rudnick sought to recover $6.8 million in attorneys' fees, exclusive of costs. This included $6,050,762.50 in fees actually billed, plus a "success fee" of $840,765.20 per the parties' Engagement Letter. As the arbitral panel acknowledged, of the over $6 million in fees actually billed, Christof and FMT had already paid Brown Rudnick $2.8 million, or "nearly 50%." Ex. L at 24.

157.    The arbitral panel found that Brown Rudnick's fees were manifestly unreasonable. In fact, the panel found that the fees Christof and FMT had already paid—$2.8 million—were unreasonable, and that FMT was entitled to "prevailing party reasonable attorneys' fees" of just $2,283,143.40. This amounted to 20 percent less than the fees Christof and FMT had already paid to Brown Rudnick. Id. at 30.

158.    The arbitral panel gave a host of reasons for its decision. First, as to the award itself, the arbitral panel noted that the recovery was "not extraordinary." FMT had sought "$ 81 million, plus treble damages . . . and attorneys' fees," but only obtained a recovery of about $4 million. Id. at 26–28.

159.    Second, while the panel acknowledged that case was complex, it found that "the vast majority of the issues presented are familiar to construction attorneys who regularly represent clients in connection with large industrial construction projects." Id.

160.    Third, as a result of Brown Rudnick's use of "block billing," the panel was "unable to undertake an evaluation of who did what and when, or whether paralegals could have provided more assistance in certain areas or whether certain time should not be assessed to the non-prevailing party." Id.

161.    Fourth, the panel explained that "competent and experienced construction counsel within law firms in closer proximity to Columbia, South Carolina [the locale of the

at-issue work] could also have provided similar services at rates that are considerably less than the rates billed by [Brown Rudnick]." Id.

162.    Fifth, the arbitral panel expressed skepticism about the contingency fee; it noted that it may have viewed the contingency fee more positively if the case had resulted in a "home run." "However," the panel stated, "we are addressing fees connected with a breach of contract and conversion victory, based on a result that was not an across the board win." Id.

163.    Finally, the panel found that the "customary fees for similar services" were significantly less than those Brown Rudnick charged. Id.

**BROWN RUDNICK NEGLECTS TO
INTRODUCE KEY DOCUMENTS IN THE ARBITRATION**

164.    Despite their thousands of hours of fees, Brown Rudnick negligently chose not to use key documents in support of FMT's South Carolina Unfair Trade Practices Act ("SCUTPA") claim during the arbitration. As a result, FMT did not prevail on that claim, which would have entitled it to treble damages.

165.    As stated above, FMT asserted nine claims against the Employers in its demand for arbitration, including claims for violation SCUTPA, fraudulent inducement, negligent misrepresentation, and breach of contract.

166.    In support of its SCUTPA claim, FMT argued that when the parties entered into the Installation Contract on August 17, 2017, the Employers knew and withheld from FMT that the delivery of structural steel was materially delayed. In particular, the Employers knew that their supplier of structural steel, Attila, would be unable to timely deliver the structural steel for the Project because of SICO's own failures to timely deliver engineering drawings and designs.

167.    FMT started its work on September 25, 2017 and was to substantially complete its installation work 337 calendar days later on August 28, 2018, all according to a specific installation sequence dictated by the Employers.

168.    As a consequence of the delay of the structural steel, however, the construction schedule could not be met and FMT incurred dramatically higher costs flowing from its consequent loss of productivity and inefficiencies, which it was unable to recover.

169.    Christof and FMT repeatedly explained to Brown Rudnick the need to demonstrate that the Employers knew at the time they hired FMT that the delivery of steel would be delayed, but failed to disclose that fact to FMT.

170.    Brown Rudnick knew that to prevail on its SCUTPA claim it would need to establish that the Employers knew of Attila's material delays which the Employers did not communicate to FMT.

171.    FMT ultimately did not prevail on its SCUTPA claim at arbitration.

172.    The arbitral panel explained what evidence was lacking from FMT's presentation at arbitration: "[i]n order to prevail on [the SCUTPA, fraudulent inducement, and negligent misrepresentation] claims, FMT would have to prove the Employers knew, or should have known that a future event to be performed by another party would not occur." Ex. L at 11.

173.    "[A]t best," however, the evidence Brown Rudnick assembled suggested that "the Employers might have had some indication that delays could occur" such that there was "insufficient evidence to find the Employers had adequate knowledge about the future performance of other parties to create an affirmative obligation to share immediately their concerns with FMT." Id. at 11-12.

174.    As a result of the above reasoning, the Arbitral Panel denied FMT's claim under SCUTPA.

175.    However, SICO had produced documents demonstrating exactly what the Arbitral Panel stated FMT had failed to prove—that SICO knew Atilla's performance under the contract would be delayed—during the course of discovery in the arbitration.[2]

176.    In other words, Brown Rudnick had exactly the documents it needed to demonstrate to the Arbitral Panel that the Employers knew that the delivery of steel would be delayed but that the Employers never apprised FMT of that fact.

177.    Brown Rudnick chose not to use these documents at arbitration.

178.    If Brown Rudnick had used these documents, it could have "prove[n] the Employers knew, or should have known that a future event to be performed by another party would not occur," namely that Swiss Krono and SICO knew the delivery of steel would be materially delayed. Ex. L at 11.

179.    If Brown Rudnick had so proven, FMT would have demonstrated that the Employers had engaged in a willful and knowing violation of SCUTPA through that unfair and deceptive practice, thus entitling FMT to treble damages.

180.    As a result of the delayed delivery of steel, FMT suffered very substantial delays and inefficiencies that caused it millions of dollars in damages.

181.    Indeed, the Arbitral Panel found that FMT suffered recoverable damages flowing from inefficiencies and losses of productivity totaling $11,556,402. Id. at 19.

---

[2] FMT and Christof are not attaching here the particular documents which Brown Rudnick failed to utilize at the arbitration because they are the subject of a protective order in the underlying arbitration. To the extent the Court would wish to view these documents, FMT and Christof are happy to seek relief from the protective order in order to file those documents.

182.    The Arbitral Panel based those damages upon the conclusion that Swiss Krono and SICO's breached the Installation Contract by failing to timely provide structural steel, foundations, and equipment to FMT. Id. at 17. As a result of those failures, Swiss Krono and SICO failed to meet the "fixed and agreed" dates set forth in the Installation Contract.

183.    FMT incurred those damages as a result of Swiss Krono and SICO's failure to disclose that it knew the delivery of steel would be delayed and that it would be unable to meet the contractual delivery dates.

184.    The inefficiencies and delays resulting in over $11 million in damages to FMT were a direct result of the delayed delivery of steel.

185.    The delayed delivery of steel meant that every aspect of FMT's work suffered from severe losses in productivity and became extremely inefficient. Every aspect of FMT's work was dependent upon the delivery of steel. Without steel, the structures necessary to install the equipment simply could not be built.

186.    Had FMT known those undisclosed facts, it would not have agreed to the schedule in the Installation Contract.

187.    Had Brown Rudnick utilized the documents demonstrating the Employers' material knowledge that the steel delivery would be delayed, FMT would have prevailed on its SCUTPA claim and been entitled to treble damages on the $11,556,402 in recoverable damages flowing from inefficiencies and losses of productivity which the Arbitral Panel awarded on FMT's breach of contract claim.

## COUNT I
## (BREACH OF THE ENGAGMENT AGREEMENT)

188.    Christof and FMT adopt, incorporate, and reallege the above paragraphs of the Counterclaim as if set forth herein.

189.    Together, the Engagement Letter and the Side Letter form a valid, binding contract between Christof, FMT, and Brown Rudnick (the "Engagement Agreement").

190.    The Engagement Letter and Side Letter were in essence part of one transaction.

191.    The Engagement Letter and Side Letter were signed at the same time.

192.    The Side Letter referenced the Engagement Letter.

193.    The Engagement Letter and Side Letter were interrelated in purpose, as both relate directly to Brown Rudnick's representation of Christof and FMT.

194.    The Engagement Letter provided that Philip Small and Wayne Dennison would have primarily responsibility for Brown Rudnick's representation of Christof and FMT with other "lawyers and Firm personnel" would be added to the team "[t]o the extent necessary and appropriate."

195.    The Engagement Letter also provided that Brown Rudnick would keep Christof and FMT "apprised relative to expected fees and costs, and communicate whenever there are important choices to be made that are likely to affect overall fees and costs."

196.    The Engagement Letter also provided for a one-time retainer of $200,000 followed by a monthly retainer of $40,000, which the parties agreed represented a budget for Brown Rudnick's fees and costs.

197.    The Side Letter provided that Brown Rudnick's aggregate fees for litigating the Barnwell Dispute through arbitration would be between $1.5 million to $2.0 million.

198.    As a matter of contractual interpretation, Brown Rudnick's deletion of language in an early draft of the Side Letter stating that the fee estimate was not a prediction means that the fee estimate is a prediction of fees.

199.    Brown Rudnick breached its obligations under the parties' agreement by, inter alia:

    a.  Informing Christof and FMT that it would keep to a budget of about $40,000 per month, then vastly and repeatedly exceeding that budget;

    b.  Informing Christof and FMT that the total fees in the Barnwell Dispute would amount to between $1.5 million and $2.0 million, then billing a total of over $6 million in fees;

    c.  Overbilling and performing duplicative, unnecessary, and time-wasting tasks;

    d.  Staffing unnecessary lawyers and personnel on the Barnwell team; and

    e.  Failing at all times to keep Christof and FMT apprised to expected fees and costs.

200.    As a result of Brown Rudnick's breaches, Christof and FMT have suffered, and will continue to suffer, substantial damages.

## COUNT II
## (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

194.    Christof and FMT adopt, incorporate, and reallege the above paragraphs of the Counterclaim as if set forth herein.

195.    Together, the Engagement Letter and the Side Letter form a valid, binding contract between Christof, FMT, and Brown Rudnick.

196.    Per its terms, this contract is to be interpreted under Massachusetts law.

197.    Inherent in every Massachusetts contract is the covenant of good faith and fair dealing, which means that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

198.    Brown Rudnick breached its obligations under the parties' agreement by, inter alia:

a.    Vastly exceeding the parties' agreed-upon budgets set forth in the Engagement Letter and Side Letter;

b.    Overbilling and performing duplicative, unnecessary, and time-wasting tasks;

c.    Staffing unnecessary lawyers and personnel on the Barnwell team;

d.    Failing to adequately supervise associates, paralegals, and other personnel rendering legal services to Christof and FMT;

e.    Failing to ensure that the legal services provided to Christof and FMT were reasonable and necessary and advanced the interest of Christof and FMT; and

f.    Drafting its time entries and invoices in a way that made it impossible to ascertain what particular tasks were being performed and how long those tasks took, thereby preventing Christof and FMT from being reimbursed for the majority of their attorneys' fees in the Barnwell Arbitration.

199.    As a result of Brown Rudnick's breach, Christof and FMT have suffered, and will continue to suffer, substantial damages.

## COUNT III
## (FRAUDULENT INDUCEMENT)

200.    Christof and FMT adopt, incorporate, and reallege the above paragraphs of the Counterclaim as if set forth herein.

201.    Brown Rudnick represented in writing to Christof and FMT that it would not "elevate the costs" of its hourly fees for the Barnwell Dispute beyond the $1.5 to $2 million estimate set out in the Side Letter, including the approximately $40,000 per month budget.

202.    To support its representation to Christof and FMT not to "elevate the costs" of its hourly fees beyond those set out in the Side Letter, Brown Rudnick deleted language from a draft of the Side Letter explaining that the estimate was not a prediction of fees.

203.    At all relevant times, including prior to its execution of the Side Letter, Brown Rudnick knew that its fees would materially exceed both the estimate in the Side Letter as well as the monthly $40,000 budget.

204.    Absent the representations Brown Rudnick made, Christof and FMT would not have engaged Brown Rudnick to represent them in connection with the Barnwell Dispute.

205.    Christof and FMT reasonably relied upon Brown Rudnick's representations.

206.    Brown Rudnick's invoices materially exceeded the estimate set out in the Side Letter.

207.    When Christof and FMT pointed out that Brown Rudnick's invoices were impermissibly high, Brown Rudnick presented a new budget, the April Estimate, to induce Christof and FMT to agree to amend the Engagement Agreement.

208.    At the time Brown Rudnick presented the April Estimate to Christof and FMT, Brown Rudnick knew that its invoices were be dramatically higher than set out in the Estimate.

209.    Brown Rudnick withheld from Christof and FMT that its fees were be far higher than those set out in the April Estimate.

210.    Absent the representations Brown Rudnick made, Christof and FMT would not have agreed to amend the Engagement Agreement.

211.    Christof and FMT reasonably relied upon Brown Rudnick's representations.

212.    Brown Rudnick's fees far exceeded the figures set out in the April Estimate.

213.    Christof and FMT expressed their dissatisfaction with Brown Rudnick exceeding the April Estimate.

214.    In order to induce FMT and Christof to enter into a second amendment to the Engagement Agreement, Brown Rudnick represented that going forward it would abide by the April Estimate.

215.    However, Brown Rudnick knew that its fees would continue to exceed those set out in the April Estimate.

216.    Christof and FMT reasonably relied upon Brown Rudnick's representations.

217.    As a result of Brown Rudnick's false representations, Christof and FMT has suffered actual and compensatory monetary damages.

## COUNT IV
### (PROMISSORY ESTOPPEL)

218.    Christof and FMT adopt, incorporate, and reallege the above paragraphs of the Counterclaim as if set forth herein.

219.    Brown Rudnick promised not to exceed the fee estimate set out in the Side Letter.

220.    Brown Rudnick later promised not to exceed the fee estimate set out in the April Estimate.

221.    FMT and Christof reasonably expected that Brown Rudnick would abide by its promises not to exceed the fees set out in the Side Letter and, later, the April Estimate.

222.    FMT and Christof relied to their detriment upon Brown Rudnick's Promises, including in the fees they ultimately paid which exceeded the amounts Brown Rudnick had promised it would bill.

## COUNT V
## (LEGAL MALPRACTICE)

223.    Christof and FMT adopt, incorporate, and reallege the above paragraphs of the Counterclaim as if set forth herein.

224.    At all relevant times, Christof and FMT and Brown Rudnick were in an attorney-client relationship. Accordingly, Brown Rudnick owed Christof and FMT a duty to properly and adequately represent Christof and FMT's interests.

225.    Brown Rudnick breached its duties by failing to exercise reasonable care and skill.

226.    Brown Rudnick's breaches of its duties included failing to use documents in the Barnwell Arbitration that, had they been presented to the Arbitral Panel, would have proven that the Employers knew that the delivery of structural steel was materially delayed and resulted in FMT prevailing on its SCUTPA claim, including for treble damages.

227.    As a direct and proximate result of Brown Rudnick's breaches of its duties, Christof and FMT have suffered, and will continue to suffer, substantial damages.

<u>COUNT VI</u>
**(VIOLATION OF CHAPTER 93A, § 11)**

228.    Christof and FMT adopt, incorporate, and reallege the above paragraphs of the Counterclaim as if set forth herein.

229.    Christof and FMT's retention of Brown Rudnick to provide legal services in connected with the Barnwell Dispute constituted engaging in trade or commerce within the meaning of M.G.L. ch. 93A, §11.

230.    Throughout the course of its representation of Christof and FMT, Brown Rudnick repeatedly and consistently engaged in unfair and deceptive practices in their dealings with Christof and FMT in violation of M.G.L. ch. 93A, §11.

231.    Brown Rudnick's violations included, inter alia:

a.  Promising Christof and FMT that it would keep to a budget of $40,000 per month, then vastly and repeatedly exceeding that budget every month;

b.  Promising Christof and FMT that the total fees in the Barnwell Dispute would amount to between $1.5 million and $2.0 million, then billing over $6 million in fees;

c.  Providing Christof and FMT with fee estimates which Brown Rudnick knew at the time the estimates were provided that it could not meet, including:

   i.  Brown Rudnick's estimate at the parties' January 6, 2020 meeting in New York, NY, wherein Brown Rudnick stated that its fees from that date forward through to mediation in April 2020 would be between $100,000 and $150,000; and

    ii.  Brown Rudnick's April Estimate, provided on April 7, 2020, wherein Brown Rudnick partner Wayne Dennison provided the following written estimate to Christof and FMT via email:

| Month | Total Monthly Fees |
|---|---|
| April 2020 | $140,000-$280,000 |
| May 2020 | $140,000-$280,000 |
| June 2020 | $100,000-$120,000 |
| July 2020 | $200,000-$300,000 |
| August 2020 | $350,000-$420,000 |
| Sept 1-Oct 2, 2020 (Arbitration Hearing) | $600,000-$700,000 |
| Oct-Nov, 2020 (Post-Hearing) | $75,000-$80,000 |

d.  Repeatedly threatening to go "pencils down" on the Barnwell Dispute—and in some cases actually following through on said threat—to pressure and induce Christof and FMT to take certain actions, including:

    i.  Pay monthly invoices that vastly exceeded Brown Rudnick's fee estimates; and

    ii.  Enter into amendments of the fee arrangement set out in the Engagement Letter.

e.  Failing to adequately supervise associates, paralegals, and other personnel rendering legal services to Christof and FMT;

f.  Failing to ensure that the legal services provided to Christof and FMT were reasonable and necessary and advanced the interest of Christof and FMT;

g.   Billing Christof and FMT for tasks that were either unnecessary, duplicative, or excessive;

h.   Drafting its time entries and invoices in a way that made it impossible to ascertain what particular tasks were being performed and how long those tasks took, thereby preventing Christof and FMT from being reimbursed for the majority of their attorneys' fees in the Barnwell Arbitration;

i.   Failing to identify key documents in the Barnwell Arbitration that, had they been presented to the Arbitral Panel, would have resulted in FMT prevailing on its fraudulent inducement claim, and;

j.   Staffing unnecessary lawyers and personnel on the Barnwell team;

233.   Christof and FMT unfair and deceptive practices were knowing, willful, and intentional.

234.   Pursuant to M.G.L. ch. 93A §2 and 11, Christof and FMT are entitled to an award of their actual damages, treble damages, attorneys' fees, and pre-judgment interest.

## REQUEST FOR RELIEF

WHEREFORE, Christof and FMT request that this Court:

1.   Enter judgment in Christof and FMT's favor on each separate count of this Counterclaim for all of Christof and FMT's actual, consequential, and compensatory damages, plus interest and attorney's fees;

2.   Treble damages; and

3.   Awarding any other such relief as this Court deems just and proper.

## JURY DEMAND

Christof and FMT demand a trial by jury on all counts and issues so triable.

Respectfully submitted,

CHRISTOF INDUSTRIES GLOBAL
GMBH and FMT US, INC.

By their attorneys,


/s/ Rachel C. Hutchinson
Benjamin J. Wish (BBO # 672743)
Rachel K. Hutchinson (BBO # 696739)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
bwish@toddweld.com
rhutchinson@toddweld.com

Dated: February 25, 2022



CERTIFICATE OF SERVICE

I, Rachel C. Hutchinson, hereby certify that this document has been filed through
the ECF system and will be sent electronically to the registered participants as identified on
the notice of Electronic Filing (NEF).


/s/ Rachel C. Hutchinson
Rachel C. Hutchinson