UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BROWN RUDNICK LLP,                          *
                                            *
        Plaintiff,                          *
                                            *
        v.                                  *      Civil Action No. 1:21-cv-11964-IT
                                            *
CHRISTOF INDUSTRIES GLOBAL                  *
GMBH and FMT US INC.,                       *
                                            *
        Defendants.                         *

MEMORANDUM & ORDER

May 31, 2021

TALWANI, D.J.

Pending before the court is Plaintiff Brown Rudnick LLP's ("Brown Rudnick") Motion

to Dismiss [Doc. No. 32] Counts III, IV and V of Defendants Christof Industries GmbH, Austria

(now Christof Industries Global GmbH) ("Christof") and FMT US Inc.'s ("FMT") Counterclaim

[Doc. No. 28]. For the following reasons, the Motion to Dismiss [Doc. No. 32] is DENIED.

I.       **Factual Background**

As alleged in the Counterclaim [Doc. No. 28] and attached documents, the facts are as

follows. Christof is an Austrian corporation that provides industrial plant construction and

industrial services. Counterclaim ¶¶ 10, 14 [Doc. No. 28]. FMT is a Christof subsidiary that

operates in the United States. Id. at ¶¶ 11, 16.

        A.      *The Barnwell Dispute*

In August 2017, FMT entered a multi-million-dollar contract with Swiss Krono and

Siempelkamp ("SICO") (collectively, the "project owners") to construct a plant in Barnwell,

South Carolina. Id. at ¶¶ 58-60. In connection with the contract, Christof executed a parent

company guarantee. Id. at ¶ 61. Several disputes arose that ultimately resulted in FMT's

termination from the project and the project owners calling upon Christof's parent company guarantee ("the Barnwell dispute"). Id. at ¶¶ 62-64.

        B.      *Engagement of Brown Rudnick*

In October 2018, Christof and FMT reached out to Brown Rudnick to discuss the possibility of Brown Rudnick representing Christof and FMT in the mediation and arbitration of the Barnwell dispute. Id. at ¶ 24. The parties negotiated the scope of Brown Rudnick's engagement over the course of several weeks, during which Christof and FMT stressed the importance of keeping costs down. Id. at ¶¶ 25-26. Christof and FMT sought a cap on Brown Rudnick's hourly fees, and Brown Rudnick agreed to provide a fee estimate letter ("side letter") setting out the anticipated fees in the case alongside their standard engagement letter Id. at ¶¶ 27-29. Christof and FMT repeatedly expressed to Brown Rudnick that it was critical for the fees and costs of representation, excluding a contingency fee component, not to exceed the estimate set out in the side letter; Brown Rudnick agreed not to exceed the estimate. Id. at ¶¶ 30-32; see also Nov. 11, 2018 email ("BR will not elevate the costs . . . . I will be overseeing this . . . .").

The engagement letter provided for contingency fees, non-contingent fees, and a retainer. Id. at ¶¶ 39-40; Engagement Letter [Doc. No. 28-2]. Under the engagement letter, Christof and FMT were required to pay an initial one-time retainer of $200,000, payable upon execution of the parties' agreement, and a supplemental ongoing retainer of $40,000 per month. Counterclaim ¶ 41 [Doc. No. 28]; Engagement Letter 4 [Doc. No. 28-2]. As to the non-contingent fee, the engagement letter provided that Christof and FMT would pay one-half of Brown Rudnick's hourly fees for services rendered, that Brown Rudnick would apply the retainer towards such fees, and that to the extent the fees exceeded the retainer, Brown Rudnick would bill Christof and FMT for the difference, and Christof and FMT would be jointly responsible for paying the entire

amount of such invoice within two weeks of receipt of the invoice. Counterclaim ¶ 39 [Doc. No. 28]; Engagement Letter 2, 4 [Doc. No. 28-2].

In the side letter, Brown Rudnick estimated that duration of the proceedings would be one year and that its aggregate discounted, non-contingent fees—i.e. the one-half fees that Christof and FMT would be required to pay contemporaneously during Brown Rudnick's representation—would be "be in the range of $750,000 to $1.0 million for a full arbitration proceeding and proceeding to vacate and/or confirm the arbitration award, but not appeals therefrom." Counterclaim ¶ 46 [Doc. No. 28]; Side Letter 1-2 [Doc. No. 28-3]. In an early draft of the side letter, Brown Rudnick included language that the estimates in the side letter were "not predictions, and the actual duration and fees could vary substantially from these estimates due to many unknown and unknowable factors and circumstances." Counterclaim ¶ 48 [Doc. No. 28]. However, Brown Rudnick removed that language from the final version of the document. Id. at ¶¶ 49-53. Christof and FMT relied on Brown Rudnick's removal of that language to mean that the fee estimate contained in the side letter was, in fact, a prediction of fees, and Brown Rudnick made repeated representation to that effect, both verbally and in writing. Id. at ¶¶ 54-56.

As to the contingent fees, the engagement letter provided that if Christof and FMT obtained a recovery in the Barnwell dispute, Christof and FMT would pay the deferred half of Brown Rudnick's usual hourly fees for services rendered, and a "success fee" if Christof and FMT recovered more than $3,990,000; the success fee varied based on the amount of the recovery, and as relevant here, was twenty percent of the portion of the recovery between zero and $6,000,000. Counterclaim ¶¶ 39-40 [Doc. No. 28]; Engagement Letter 2-3 [Doc. No. 28-2].

C.      *Brown Rudnick's Escalating Fees*

As soon as Brown Rudnick began its representation of Christof and FMT, its monthly

invoices for non-contingent fees radically outpaced the fee estimate in the side letter.

Counterclaim ¶ 70 [Doc. No. 28]. In contravention of the obligations set out in the engagement

letter to "keep [Christof and FMT] apprised relative to expected fees and costs" and despite

Christof and FMT's repeated inquiries about billing, Brown Rudnick failed to keep Christof and

FMT apprised of their increasing bills. Id. at ¶ 73. Brown Rudnick never told Christof and FMT

that its expected fees and costs would exceed the estimate set out in the side letter. Id. at ¶ 74.

The size of Brown Rudnick's team of attorneys and other billable professionals working

on the case also quickly contravened the contractual terms of the engagement letter. Id. at ¶ 75.

Although the engagement letter stated that two lawyers would have primary responsibility for the

engagement and that other "lawyers and Firm personnel" would be added to the team only "[t]o

the extent necessary and appropriate," id at ¶ 37, by the time the Barnwell dispute ended, twenty-

seven Brown Rudnick employees had worked on the team, id. at ¶ 77. The number of employees

on the case contributed to Brown Rudnick's inefficiencies because responsibilities were divided

among many individuals such that no individual attorney had mastery of the case. Id. at ¶¶ 80-83.

These problems arose almost immediately after Brown Rudnick's representation of

Christof and FMT began. Id. at ¶ 84. On December 29, 2018, FMT, through Brown Rudnick,

filed a demand for arbitration against the project owners. Id. at ¶ 65. For December 2018, the

first full month of Brown Rudnick's representation of Christof and FMT, Brown Rudnick billed

a total of $254,590 in monthly fees. Id. at ¶¶ 85-86. The invoice included significant time by five

lawyers, including two associates and a third partner that Brown Rudnick had added to the team.

Id. at ¶¶ 88-90. Brown Rudnick consistently spent substantially more time than necessary on

simple tasks and used block billing to obscure the time spent on individual tasks and to justify its overbilling. Id. at ¶¶ 91-95.

D.      *Brown Rudnick's Extension of the Barnwell Dispute*

In the side letter, Brown Rudnick had estimated that the dispute would take only a year to litigate through mediation and arbitration. Id. at ¶ 96. However, this timeline was significantly extended due to Brown Rudnick's insistence that Christof and FMT participate in mediation with the project owners prior to the arbitration. Id. at ¶ 97. Even though Brown Rudnick agreed that mediation was unlikely to be successful given how far apart the parties were in their negotiations, Brown Rudnick insisted that it would "look bad" if Christof and FMT refused to mediate. Id. at ¶¶ 98-100. A mediation date was set for April 2020, which, at that point, was more than a year away. Id. at ¶ 101.

E.      *Christof and FMT's Attempts to Reduce Billing*

In the intervening year, Brown Rudnick continued to bill well above the estimated $40,000 per month, sometimes by an order of magnitude. Id. at ¶¶ 102-103. After receiving Brown Rudnick's September 2019 and October 2019 invoices for fees of $281,584.50 and $441,952.00 respectively, one of Christof's executives emailed his dismay to Brown Rudnick, stating that if the company had known how high the bills would be, it would have paid closer attention to how its initial $200,000 retainer was being used. Id. at ¶ 106. Christof and FMT agreed to pay the September invoice, but sought assurances that Brown Rudnick would not radically exceed the cap again. Id. at ¶ 107. However, Brown Rudnick's November 2019 invoice amounted to $164,028.50 in fees, which pushed Brown Rudnick's total fees to-date above $2 million, even before the mediation or arbitration had begun. Id. at ¶¶ 108-109. The September,

October, and November 2019 invoices contained significant overbilling for unnecessary and duplicative tasks. Id. at ¶¶ 110-111.

In December 2019, Christof's CEO, CFO, and other Christof executives asked to meet with Brown Rudnick in New York to discuss how to keep Brown Rudnick's fees and costs down. Id. at ¶ 112. The parties met in January 2020 and agreed to move forward and work together to minimize Brown Rudnick's costs. Id. at ¶¶ 113-14. Brown Rudnick provided an estimate that its fees from the meeting through to mediation in April 2020 would be between $100,000 and $150,000. Id. at ¶ 115. However, Brown Rudnick invoice for January 2020 alone amounted to $270,023.50, nearly double the ceiling of fees that Brown Rudnick had estimated just the month prior. Id. at ¶ 116. As with earlier invoices, the January 2020 invoice contained numerous examples of overbilling, vague time entry descriptions, and duplicative work, including numerous hours spent "assembling binders" and "preparing for meetings," and bills for unspecified amounts of "travel time." Id. at ¶ 119. In addition, contrary to the parties' agreement that Christof and FMT would be responsible for reviewing documents, Brown Rudnick attorneys continued to review documents. Id. at ¶¶ 120-21.

F.     *Renegotiation of the Fee Agreement*

In February 2020, the parties renegotiated their fee agreement. Id. at ¶ 125. According to the new agreement, Christof and FMT would pay the November 2019, December 2019, and January 2020 invoices at the fifty percent discounted rate, and in exchange, Brown Rudnick would cap its fees through the mediation at $50,000 at the discounted rate. Id. at ¶ 125. The parties hoped that the mediation would resolve the Barnwell dispute and agreed to revisit the issue of fees if mediation was unsuccessful. Id.

The mediation, which took place on April 2 and 3, 2020, was unsuccessful. Id. at ¶¶ 126-27. Accordingly, to restart the parties' fee discussions, Christof and FMT asked Brown Rudnick to provide an updated fee estimate. Id. at ¶ 128. On April 7, 2020, Brown Rudnick estimated that its fees going forward would amount to over $2.1 million for the remaining eight months of Brown Rudnick's representation, as follows:

| Month | Total Monthly Fees |
| --- | --- |
| April 2020 | $140,000-$280,000 |
| May 2020 | $140,000-$280,000 |
| June 2020 | $100,000-$120,000 |
| July 2020 | $200,000-$300,000 |
| August 2020 | $350,000-$420,000 |
| Sept 1-Oct 2, 2020 (Arbitration Hearing) | $600,000-$700,000 |
| Oct-Nov 2020 (Post-Hearing) | $75,000-$80,000 |

Id. at ¶¶ 129-31. To justify this estimate, Brown Rudnick explained that (1) the "anticipated hearing date" had been set later than anticipated, and (2) the Barnwell dispute required significantly more work than had been anticipated at the time the parties executed the side letter. Id. at ¶¶ 132-33.

Three days later, Brown Rudnick stated it was halting all work on the matter unless an agreement on paying the outstanding fees was reached. Id. at ¶ 134. In reliance on Brown Rudnick's new estimate, Christof and FMT agreed to negotiate an amendment of the engagement letter's payment terms. Id. at ¶ 136. Over the next week, the parties negotiated the terms of the amendment. Id. at ¶ 137. Christof and FMT repeatedly stressed the importance that Brown Rudnick stick to the fees outlined in the April estimate. Id.

On April 21, 2020, Brown Rudnick sent an email to Christof and FMT stating

> We fully acknowledge and understand your fee sensitivity and will commit that, on a monthly basis, we will consult with you as to how our fees compare to the budget with which you were provided on April 6. We will, of course, also commit to trying to minimize your fees and to trying to deliver our services for less than the amount that we have budgeted.

Id. at ¶ 138. Based on these representations, Christof and FMT agreed to execute the amendment to the engagement letter. Id. at ¶ 140. The amendment set out dates by which Christof and FMT were required to make certain payments and provided two fee arrangement options for Christof and FMT's election. Id.

Despite its assurances, in May 2020, Brown Rudnick invoiced $544,804.50 in legal fees, almost double the high end of the estimate. Id. at ¶ 142. When Christof and FMT balked at paying these unexpectedly high fees, Brown Rudnick halted work on June 3, 2020. Id. at ¶ 145. Christof and FMT agreed to pay because it would have placed them at a severe disadvantage to hire new legal counsel. Id. at ¶ 146.

On June 4, 2020, Brown Rudnick proposed a second amendment to the engagement letter's payment terms "in an effort to formalize our relationship going forward." Id. at ¶ 147. Like the first amendment, the second amendment set out dates by which Christof and FMT were required to make certain payments and provided two fee arrangement options for Christof and FMT's election. Id. However, Christof and FMT were reluctant to enter into the second amendment because of Brown Rudnick's past billings and "lack of transparency" in relation to the fees. Id. at ¶ 148. In response, Brown Rudnick assured Christof and FMT that going forward, they would abide by the April 7, 2020 fee estimate. Id. at ¶ 150. But, in June 2020, Brown Rudnick invoiced $344,084.00, almost three times the high end of the estimate. Id. at ¶ 151. Ultimately, Christof and FMT agreed to a second amendment to the engagement letter's payment terms, which was executed on July 16, 2020. Id. at ¶ 153.

By the time Brown Rudnick's representation ended, its invoiced fees for the non-contingent portion amounted to just over $3 million, more than triple the original side letter estimate. Id. at ¶ 71; Arbitration Award 25, n.9 [Doc. No. 28-12] (Brown Rudnick invoiced fees of $3,025,381.25 prior to the interim arbitration award). Brown Rudnick's total fees including contingent amounts came to $6.8 million, exclusive of costs. Counterclaim ¶ 156 [Doc. No. 28]; This included $6,050,762.50 in hourly fees,[1] plus an additional "success fee" of $840,765.20 per the parties' engagement letter. Id. Of the fees billed, Christof and FMT had paid Brown Rudnick $2.8 million. Id.

G.      *The Arbitral Panel's Finding on Fees*

At the arbitration, FMT prevailed on two of nine affirmative claims and prevailed in part, on its affirmative defenses: although FMT had claimed $81 million in damages plus treble damages and attorneys' fees and SICO had sought $34 million from FMT, FMT only prevailed on "a positive recovery of approximately US$24 million (reduced by [SICO's] prior advance of approximately US$20 million)," for a net recovery of only $4,203,826. Arbitration Award 28 [Doc. No. 28-12]; Counterclaim ¶ 154 [Doc. No. 28]. As the prevailing party, however, FMT was entitled to its reasonable attorneys' fees and costs. Counterclaim ¶ 155 [Doc. No. 28]. FMT sought to recover the full amount of fees claimed by Brown Rudnick. Id. Accordingly, as part of the final award, the arbitral panel analyzed Brown Rudnick's fees. Id.

The arbitral panel found that FMT was entitled to "prevailing party reasonable attorneys' fees" of just $2,283,143.40. Id. at ¶ 157. The arbitral panel based its conclusion on the facts that

---

[1] The $6,050,762.50 invoiced after the award, see Arbitation Award 25, n.9 [Doc. No. 28-12], appears to be the 100% of customary fees due once Christof and FMT had obtained a recovery in the Barnwell dispute, and not the 50% non-contingent amount.

(1) the recovery in the arbitration was "not extraordinary"; (2) "the vast majority of the issues presented [we]re familiar to construction attorneys who regularly represent clients in connection with large industrial construction projects"; (3) Brown Rudnick's use of block billing rendered the panel "unable to undertake an evaluation of who did what and when, or whether paralegals could have provided more assistance in certain areas or whether certain time should not be assessed to the non-prevailing party"; (4) "competent and experienced construction counsel within law firms in closer proximity to Columbia, South Carolina could also have provided similar services at rates that are considerably less than the rates billed by [Brown Rudnick]"; and (5) the "customary fees for similar services" were significantly less than those Brown Rudnick charged. Id. at ¶¶ 158-61, 163. The panel also found the contractual contingency fee provision not relevant to determining the amount of the lodestar fees. Arbitration Award 28 [Doc. No. 28-12].

> H.      *Brown Rudnick's Failure to Introduce Key Documents in the Arbitration*

In addition to the issues related to fees, Christof and FMT allege that Brown Rudnick also failed to introduce key documents during the arbitration in support of FMT's claim for violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), and that, as a result, FMT did not prevail on that claim, which would have entitled it to treble damages. Counterclaim ¶ 164 [Doc. No. 28]. Specifically, in support of its SCUPTA claim, FMT argued that when the parties entered into the installation contract on August 17, 2017, the project owners knew and withheld from FMT that their supplier of structural steel, Attila, would be unable to timely deliver the structural steel for the project because of SICO's own failures to timely deliver engineering drawings and designs. Id. at ¶ 166. As a result of this delay, FMT was unable to meet its construction schedule, and FMT incurred dramatically higher costs flowing from its consequent

loss of productivity and inefficiencies. Id. at ¶¶ 167-68. Christof and FMT repeatedly explained to Brown Rudnick the need to demonstrate that the project owners knew, at the time they hired FMT, that the delivery of steel would be delayed and that they failed to disclose that fact to FMT. Id. at ¶ 169.

During discovery, SICO produced documents demonstrating that it knew Atilla's performance under the contract would be delayed. Id. at ¶ 175. However, Brown Rudnick chose not to use these documents at arbitration, and the arbitration panel denied FMT's SCUPTA claim. Id. at ¶¶ 174, 177. The panel explained that FMT had failed to establish this claim because the evidence suggested that the project owners "might have had some indication that delays could occur" but was insufficient to conclude that they "had adequate knowledge about the future performance of other parties to create an affirmative obligation to share immediately their concerns with FMT." Id. at ¶ 173.

## II.     Procedural Background

On December 6, 2021, Brown Rudnick filed a Complaint [Doc. No. 1-1] against Christof and FMT, asserting breach of contract and violation of Massachusetts' consumer protection statute, Mass. Gen. Laws ch. 93A, § 11. FMT and Christof moved to dismiss the chapter 93A claim. Mot to Dismiss [Doc. No. 6] The court granted the motion and dismissed the claim without prejudice to its reinstatement on a timely motion to amend. Elec. Order [Doc. No. 25].

Christof and FMT answered and asserted six counterclaims: breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), fraudulent inducement (Count III), promissory estoppel (Count IV), legal malpractice (Count V), and violation of chapter 93A (Count VI). Counterclaim [Doc. No. 28]. This Motion to Dismiss [Doc. No. 32] Counts III, IV and V followed.

### III.    Standard of Review

In evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff[-in-counterclaim]'s favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a counterclaim must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a [counterclaim] attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant[-in-counterclaim] is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009).

When a counterclaimant brings claims sounding in fraud, there is an exception to Rule 12(b)(6)'s general plausibility pleading standard. See N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009) (holding that the particularity requirement applies not only to actual fraud claims but also to "associated claims where the core allegations effectively charge fraud"). Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, a party must state "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Rule 9(b) requires that a claimant's averments of fraud specifically plead the time, place, and content of the alleged false representation. Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 22 (1st Cir. 2017).

12

## IV.   Discussion

### A.   *Legal Malpractice*

Under Massachusetts law, a claim for legal malpractice "requires a plaintiff to prove: (1) an attorney-client relationship; (2) a duty to exercise a reasonable degree of care and skill in the performance of the attorney's legal duties; (3) a violation of this duty; and (4) reasonably foreseeable harm caused by the attorney's negligence." Alicea v. Commonwealth, 466 Mass. 228, 234 n.9, 993 N.E.2d 725 (2013) (citing Correia v. Fagan, 452 Mass. 120, 127, 891 N.E.2d 227 (2008). Brown Rudnick argues that the Counterclaim [Doc. No. 28] is based solely on conclusory allegations where it (1) does not attach or identify a single specific document, or its contents, that Brown Rudnick allegedly failed to introduce and (2) provides the court with no basis to assess how the alleged unintroduced materials might have led the arbitration panel to a different outcome. Brown Rudnick also argues that the counterclaimants cannot succeed on their SCUPTA claim.

These arguments might be appropriate on summary judgment or at trial. At this stage in the litigation, though, Christof and FMT need not prove that they are likely to prevail on the merits of their claims; they need only allege facts demonstrating that they have a *plausible* basis for relief. Twombly, 550 U.S. at 556. Accepting all the factual allegations of the complaint as true, Christof and FMT have adequately alleged that Brown Rudnick represented them in the Barnwell dispute and had a duty to exercise reasonable care in the performance of that representation, that Brown Rudnick chose not to introduce key documents to the arbitration panel, and that the arbitration panel therefore found against Christof and FMT on the SCUPTA claim. Such allegations are sufficient to withstand dismissal.

That said, Brown Rudnick is certainly entitled to learn through discovery which specific documents Christof and FMT contend Brown Rudnick "chose" not to introduce. Christof and FMT allege that SICO produced these documents but that they have not been attached to the counterclaim "because they are the subject of the a protective order in the underlying arbitration." Counterclaim 38, n.2 [Doc. No. 28]. Christof and FMT state that "[t]o the extent the Court would wish to view these documents, FMT and Christof are happy to seek relief from the protective order[.]" Id. Christof and FMT will have an obligation to disclose the particular documents to Brown Rudnick during discovery, and these documents will be necessary to establish Christof and FMT's claim. Accordingly, the court will entertain a motion to stay all discovery relating to the legal malpractice claim until Christof and FMT obtain relief from the protective order, allowing the parties to use the specific protected documents referenced by Christof and FMT in connection with this litigation.

B.      *Promissory Estoppel*

To state a claim for promissory estoppel under Massachusetts law, a plaintiff must allege that "(1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise.'" Loranger Const. Corp. v. E. F. Hauserman Co., 6 Mass. App. Ct. 152, 154, 374 N.E.2d 306, aff'd, 376 Mass. 757, 384 N.E.2d 176 (1978). "When a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory.'" Loranger, 376 Mass. at 761. Accordingly, "an action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all

14

the necessary elements of a contract other than consideration." <u>R.I. Hosp. Trust Nat'l Bank v.</u>

<u>Varadian</u>, 419 Mass. 841, 850, 647 N.E.2d 1174 (1995).

The <u>Counterclaim</u> [Doc. No. 28] alleges that Brown Rudnick first promised not to exceed

the fee estimate made in the side letter to induce Christof and FMT to engage Brown Rudnick,

and then that the firm promised not to exceed the April 2020 estimate to induce the continued

engagement. That suffices to state a claim.

Brown Rudnick argues that its fee estimates could not give rise to a promissory estoppel

claim where the estimates were never actually promises intended to induce reliance. The court

agrees that the side letter itself does not suffice for a promissory estoppel claim. But where

Christof and FMT have alleged that Brown Rudnick repeatedly made specific promises not to

bill above the estimates, the court must accept those allegations as true on a motion to dismiss.

Brown Rudnick also argues that "the contemporaneous conduct and agreements of the parties"

render the alleged promises implausible," but the court cannot draw such inferences at this stage

of the proceedings. Third, Brown Rudnick argues that the parol evidence rule precludes any prior

emails or the side letter from being considered in assessing the terms of the engagement letter.

That rule may apply on a contract claim where the contract is ambiguous (though even there, the

court would need to consider Christof and FMT's argument that the engagement letter and the

contemporaneous side letter formed a single contract). But on a promissory estoppel claim, the

side letter and emails certainly may be considered in determining whether a promise not to

exceed the amount was made to induce Christof and FMT to enter into the contract. Finally,

Brown Rudnick argues that its alleged promise not to exceed the April estimate is inconsistent

with the record. But, again, at this point in the proceedings, it is not the function of the court to

weigh the evidence.

C.      *Fraudulent Inducement*

To state a claim for fraudulent inducement, a plaintiff must allege facts plausibly

suggesting that a defendant knowingly made a false statement of material fact, that the statement

was made to induce the plaintiff to act on it, and that the plaintiff reasonably relied upon that

false statement to his or her detriment. See Masingill v. EMC Corp., 449 Mass. 532, 544, 870

N.E.2d 81 (2007). Here, the Counterclaim [Doc. No. 28] alleges that Brown Rudnick made

repeated representations to Christof and FMT that it would not exceed its fee estimates; that

Brown Rudnick knew that its fees would materially exceed the estimates; that but for Brown

Rudnick's representations, Christof and FMT would not have engaged the firm to represent them

in the Barnwell dispute; and that Brown Rudnick's fees massively exceeded the estimate. In

addition, Christof and FMT allege that when they raised concerns about the fees, Brown Rudnick

presented the new April estimate; that Brown Rudnick knew that its future fees would far exceed

the April estimate; that but for Brown Rudnick's representations, Christof and FMT would not

have agreed to amend the engagement letter; and that Brown Rudnick's fees far exceeded the

figures set out in the April estimate. Similarly, Christof and FMT allege that they would not have

agreed to the second amendment but for Brown Rudnick's representations that, going forward, it

would abide by the April estimate. These allegations are sufficient to state a claim.

In opposition, Brown Rudnick argues that the estimates were never intended to be

promises and therefore cannot give rise to a fraudulent inducement claim. But, as with the

promissory estoppel claim, that argument would require the court to disregard Christof and

FMT's allegations that Brown Rudnick in fact promised not to bill above the estimates.

Next, Brown Rudnick argues that Christof and FMT failed to sufficiently allege the

knowledge element of their fraud claim. However, the Counterclaim [Doc. No. 28] contains

detailed allegations that Brown Rudnick took many actions—including significantly expanding

the size of its litigation team and overbilling for simple tasks—that if true would support an

inference that Brown Rudnick knew that its fees would exceed the estimates. And although

predictions about future events are not usually actionable, they may be where the party making

the representation has superior knowledge and intends to leverage that advantage at the

plaintiff's expense. See Zimmerman v. Kent, 31 Mass. App. Ct. 72, 80, 575 N.E.2d 70 (1991);

Cellucci v. Sun Oil Co., 2 Mass. App. Ct. 722, 731, 320 N.E.2d 919 (1974), aff'd sub nom.

Cellucci v. Sun Oil Co. of Pennsylvania, 368 Mass. 811, 331 N.E.2d 813 (1975).

V.      **Conclusion**

For the foregoing reasons, Brown Rudnick's Motion to Dismiss [Doc. No. 32] is

DENIED.

IT IS SO ORDERED

May 31, 2021                                         /s/ Indira Talwani
                                                    United States District Judge